**The JERSEY HEIGHTS NEIGH-
BORHOOD ASSOCIATION,
et al., Plaintiffs,**

**v.**

**Parris GLENDENING, et al., Defendants.**

**Civil Action No. S–97–3127.**

United States District Court,
D. Maryland.

April 28, 1998.

Deborah A. Jeon, American Civil Liberties Union, Centreville, MD, Steven P. Hollman, Hogan & Hartson, L.L.P., Washington, DC, for Jersey Heights Neighborhood Ass'n, Charles K. Whittington, Ann V. Church, Daniel Appleby, James Boone, Billy Chandler, Rita Chandler, Elsie M. Trader, Dwight Waters, Madeline Waters, Starr Sherrie Waters, Shirley Winder.

John S. Vander Woude, Eccleston & Wolfe, James M. Timmerman, Eccleston & Wolfe, P.C. Baltimore MD, for Philip L. Tilghman, Theodore Shea, Wicomico County, Maryland.

Allen F. Loucks Office of U.S. Atty., Lynne A. Battaglia, U.S. Atty., Baltimore, MD, for Federal Highway Admin., Rodney E. Slater, U.S. Dept. of Transportation.

1. The Federal Defendants are the Federal Highway Administration, Rodney E. Slater, in his official capacity as Secretary of the United States Department of Transportation, and the United States Department of Transportation.

2. The State Defendants are Parris N. Glendening, in his official capacity as Governor of the State of Maryland, the State of Maryland, Parker F. Williams, in his official capacity as Administrator of the Maryland State Highway Administration, the Maryland State Highway Administration,

## MEMORANDUM OPINION

SMALKIN, District Judge.

This matter is before the Court on the Federal Defendants'[1] Motion to Dismiss, the State Defendants'[2] Motion to Dismiss or, in the alternative, for Summary Judgment, and the Local Defendants'[3] Motion to Dismiss or, in the alternative, for Summary Judgment. The matter has been fully briefed, and no oral hearing is necessary. Local Rule 105.6 (D.Md.).

Back in the 1970s, officials at various levels of government began actively planning construction of a Route 50 Bypass around the city of Salisbury, Maryland (the "Bypass"). Route 50 is a major artery on Maryland's Eastern Shore, carrying large volumes of ocean-bound traffic in the summer. In 1980, the State Highway Administration chose Alternate 4 as the preferred route for the Bypass. Alternate 4 runs through Plaintiffs' African–American neighborhood, Jersey Heights. Plaintiffs filed this complaint, on September 15, 1997, against federal, state and local officials challenging Alternate 4, claiming that the route was selected in violation of a number of federal and state laws.

For the reasons stated below, the statute of limitations and the doctrine of laches bar plaintiffs' claims under 42 U.S.C. §§ 1983, 1985, 2000d, the Federal Aid Highway Act, and the National Environmental Policy Act, and plaintiffs have failed to state a claim for relief under the Fair Housing Act. Therefore, the federal claims are barred as a matter of law, and the Court declines to exercise supplemental jurisdiction over the state law claim. Thus, the Court will grant defendants' motions to dismiss the complaint. The Court need not reach defendants' alternative grounds for dismissal.

David L. Winstead, in his official capacity as Secretary of the Maryland Department of Transportation, and the Maryland Department of Transportation.

3. The Local Defendants are Philip L. Tilghman, in his official capacity as President of the Wicomico County Council, and Theodore Shea, in his official capacity as Acting Director of the Wicomico County Planning and Zoning Office, and Wicomico County, Maryland.

### A. *Plaintiffs' Ripeness Argument*

The Court will first address plaintiffs' ripeness argument. In their consolidated opposition to defendants' motions to dismiss, plaintiffs argue that if they had filed a lawsuit prior to March 1997, when the Bypass received final approval and funding, a court would have been obligated to dismiss it for lack of ripeness, because plaintiffs' injuries would have been "wholly dependent upon contingent future events." Plts.' Opp'n at 32. The Court disagrees. The ripeness doctrine prohibits plaintiffs from bringing their cases too soon, before an actual injury has occurred. In determining whether a case is ripe for adjudication, a court evaluates "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Lab. v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

With respect to the "fitness of the issues for judicial decision," the factual context surrounding plaintiffs' claims (except the Fair Housing Act claims, discussed below) had been amply developed, including a comprehensive administrative record, so as to permit effective adjudication years ago, long before the highway received final approval and funding in 1997. With respect to "hardship to the parties of withholding court consideration," defendants would have faced the prospect of incurring great expense, energy and waste of time in proceeding with a highway project with the uncertainty of whether, in the end, their efforts were based on unlawful environmental impact statements or an otherwise flawed decision-making process. *See Oregon Natural Resources Council v. Harrell,* 52 F.3d 1499, 1503 (9th Cir.1995) ("[I]t is more pragmatic to review [Agency] action at the end of the agency's decision-making process than after Congress has appropriated funds."). Consequently, it is unlikely that a court would have dismissed their claim for lack of ripeness had plaintiffs filed it years ago, after the environmental impact statements were finalized and memorialized in an official rule of decision ("ROD").

### B. *Plaintiffs' Continuing Violation Theory Argument*

Plaintiffs' attempt to rely on the continuing violation theory to bootstrap the discrimination that has allegedly occurred over the past century into an action against defendants filed in 1997 is unsustainable. The Supreme Court recognized the continuing violation theory in *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), a Fair Housing Act case. In *Havens,* the plaintiffs' claims were based on "a continuing violation manifested in a number of incidents—including at least one . . . that is asserted to have occurred within the [limitations period]." *Id.* at 381, 102 S.Ct. 1114. Here, in contrast, plaintiffs do not cite any specific incident of discrimination that allegedly occurred within the applicable limitations periods. *See McKenzie v. Sawyer,* 684 F.2d 62, 72 (D.C.Cir.1982)("Plaintiffs may not utilize the continuing violation theory to resurrect claims about discrimination concluded in the past, even though its effects persist."); *Woodard v. Lehman,* 717 F.2d 909 (4th Cir. 1983) (holding that violation is not actionable where there is no identification of a single discrete act of overt discrimination within [the limitations period] ). In short, to qualify for the continuing violation theory, plaintiffs must, at a minimum, allege that an act of discrimination occurred within the limitations period, and they have failed to do so. Vague assertions that defendants' unlawful conduct has "continued to the present" do not suffice.

### C. *Civil Rights Act—42 U.S.C. §§ 1983, 1985 and 2000d (Counts I, VII, and II)*

Because §§ 1983, 1985 and 2000d (Title VI) of Title 42 specify no limitations periods, federal courts turn to state law for statutes of limitations in actions brought under these civil rights statutes. *Burnett v. Grattan,* 468 U.S. 42, 104 S.Ct. 2924, 82 L.Ed.2d 36 (1984). The proper limitations period in Maryland for actions under 42 U.S.C. §§ 1983, 1985 and Title VI is three years, as provided by Md. Ann.Code, Cts. & Jud. Proc. § 5-101. *See Grattan v. Burnett,* 710 F.2d 160 (4th Cir.1983) (§§ 1983 and 1985), *aff'd* 468 U.S. 42, 104 S.Ct. 2924, 82 L.Ed.2d 36 (1984); *Wrenn v. McFadden,* 1988 WL 92861, **1 (4th Cir.1988) (unpublished) (Title VI).

To determine whether plaintiffs' civil rights claims were filed within the three-year limitations period, the Court must determine when those causes of action accrued. Local defendants argue that plaintiffs' civil rights causes of action accrued when the Federal Highway Administration ("FHA") issued its ROD (August 17, 1989), or when plaintiffs filed an administrative claim with the Department of Transportation (April 19, 1994). Local Def.'s Mot. to Dismiss at 4–6 and 13–14. Plaintiffs argue, on the other hand, that their civil rights causes of action did not accrue until March 1997, when the Bypass project received final funding and approval. Plts.' Opp'n at 32, 35 n. 11.

 Although it might be difficult to pinpoint the exact moment when plaintiffs' civil rights actions accrued in this case, it is clear to this Court that they accrued before September 15, 1994, three years prior to the filing of this suit. As plaintiffs point out, under federal law, a cause of action accrues "when the plaintiff is aware of the wrong and can successfully bring a cause of action." *Acri v. International Ass'n of Machinists and Aerospace Workers*, 781 F.2d 1393, 1396 (9th Cir.1986); *see also Nasim v. Warden. Md. House of Correction*, 64 F.3d 951, 955 (4th Cir.1995) (*en banc*) ("The accrual date is a matter of federal law, and '[u]nder federal law a cause of action accrues when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action.'"). Plaintiffs were aware, or should have been aware, of defendants' allegedly unlawful conduct not later than 1988 or 1989. And plaintiffs could have successfully brought a cause of action at that time.

Looking more specifically at plaintiffs' civil rights claims, the Court notes that plaintiffs assert that defendants discriminated against them on the basis of race when plaintiffs were excluded from the site selection process for the Bypass, Compl. at 41, and that they "were effectively disenfranchised from the political process ... by which decisions affecting the Jersey Heights community were made." *Id.* These assertions challenge the decision-making process itself, which literally went on over decades, but was completed by 1989. Plaintiffs, in alleging that that process violated federal law, would have had a con-

crete injury while the process was ongoing (and certainly by the time the final decision was made), enabling plaintiffs to successfully bring an action challenging the decision-making process at that time. Plaintiffs could have, for example, requested injunctive relief to compel the officials to comply with the statutes they now claim have been consistently violated over the years. Even if plaintiffs were unaware of these allegedly discriminatory actions while they were occurring, because they lacked notice of the process, they certainly discovered them, or should have discovered them, with due diligence, by 1988, when some Jersey Heights residents did receive notice about the Bypass project, including the route selection process. Compl. at 47. By the time plaintiffs discovered the Alternate 4 decision in 1988, it apparently was a "fait accompli." Compl. at 47. Nevertheless, plaintiffs could have, and should have, challenged defendants' allegedly unlawful conduct within three years of the discovery of its manifestation. Moreover, even if it would have been impossible for plaintiffs to discover the Alternate 4 decision in 1988, plaintiffs should have discovered it when the FHA issued its ROD memorializing the final selection of Alternate 4, on August 17, 1989. Thus, these claims accrued in 1988 or, at the latest, August 17, 1989, and plaintiffs' claims, having been filed on September 15, 1997, well more than three years thereafter, are irretrievably time-barred.

 Many of plaintiffs' assertions relate to preparation of the draft Environmental Impact Statement ("EIS") and the final EIS. According to plaintiffs, State Highway Administration officials, in preparation of the draft EIS and final EIS, failed to use meaningful data or to consider socio-economic and historical impacts of the project on African-Americans, failed to compare alternatives in relation to impact on racial minorities, and inadequately considered measures to mitigate the negative impact of the Bypass on plaintiffs. Plaintiffs' civil rights claims that the preparation of the draft EIS and final EIS violated federal law accrued when the ROD was issued approving Alternate 4 for the Bypass, *i.e.*, August 17, 1989. These claims, having been filed on September 15,

1997, more than three years thereafter, are time-barred.

Plaintiffs raise some claims that arose subsequent to the issuance of the final EIS and ROD, but these claims are also barred by the statute of limitations. For example, plaintiffs claim that the Local Defendants authorized construction of a radio tower and office building in the path of the proposed road and that SHA decided to shift the proposed location of the Bypass even closer to plaintiffs' neighborhood. Compl. at 52. This action occurred in 1991 or early 1992, Compl. at 53, and plaintiffs did not file suit on these items within the three-year statute of limitations. Thus, these claims are time-barred as well.

The statute of limitations protects the judicial interest in preventing the staleness of claims, requiring lawsuits to be filed when memories are still fresh and witnesses are still alive. It is the nature of major highway construction projects that they involve lengthy, complex, and highly bureaucratized processes, from conception of the idea to actual construction of the road. It would be utterly unfair to the government, and a waste of resources, for potential plaintiffs to sit by the side of the proposed road for years, and even decades, and then, at the last minute, when funds are finally approved, spring from their seats and sue the government. Plaintiffs' causes of actions under 42 U.S.C. §§ .1983, 1985 and Title VI, having accrued more than three years prior to the filing of the complaint, are barred by the statute of limitations, and this Court must dismiss them.

D. *Fair Housing Act—42 U.S.C. §§ 3604, 3608 (Count III)*

The Fair Housing Act ("FHA") makes it unlawful "(a) to refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status or national origin; (b) to discriminate against any person in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, or to otherwise make unavailable any dwelling ... because of race, color, religion, sex,

familial status or national origin." 42 U.S.C. § 3604.

It is well established that a court should not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts ... which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). When ruling on a motion to dismiss under 12(b)(6), a court must accept the allegations contained in the complaint as true, and must liberally construe the complaint as a whole. *Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969); *Finlator v. Powers,* 902 F.2d 1158 (4th Cir.1990). Applying these standards, the Court finds that plaintiffs have failed to state a claim under the FHA, and the Court will grant defendants' motion to dismiss Count III of the complaint.

In their opposition, plaintiffs propound a broad application of the FHA. First, plaintiffs allege that the Bypass will "otherwise make unavailable" dwellings to African Americans, on discriminatory grounds, in violation of § 3604(a), by putting "a stop to any further housing development in Jersey Heights by serving as the northern and western boundaries for the County's African American community" and by "locking existing African Americans into a racially compacted area, thus perpetuating segregation." Pls.' Opp'n at 62–63. Plaintiffs have failed to state a claim under § 3604(a). This Court declines to follow the non-binding cases that plaintiffs cite in their opposition that broadly apply the FHA to reach "every practice which has the effect of making housing more difficult to obtain on prohibited grounds." Compl. at 60. Liberally construing plaintiffs' complaint, this Court finds that plaintiffs' vague allegations that the Bypass will prevent additional low income housing in Jersey Heights, and will perpetuate segregation by "lock[ing] in existing African Americans into a racially compacted area," Compl. at 63, fail to state a claim under § 3604(a) of the FHA.

Even if plaintiffs had stated a claim under § 3604(a), any such claim is not ripe for adjudication. Unlike plaintiffs' complaints about discrimination in route selection, these vague allegations implicate the

ripeness concerns of "fitness of the issues for judicial decision" and "hardship to the parties of withholding court consideration." *See Abbott Lab. v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Plaintiffs do not name an individual who will be denied a dwelling, or what dwelling will be denied, or when; nor do plaintiffs name an "existing African American" who desires to leave the neighborhood who will be "locked in." There is good reason for plaintiffs' failure to provide more factual detail—the facts have not yet occurred, because the claims are based on hypothetical and contingent future events. Here, a more-developed factual context regarding these claims is necessary to ensure effective adjudication on the merits.[4] *See Socialist Labor Party v. Gilligan*, 406 U.S. 583, 587, 92 S.Ct. 1716, 32 L.Ed.2d 317 (1972) ("[T]he record ... now before this Court, is extraordinarily skimpy in the sort of proved or admitted facts that would enable us to adjudicate this claim."). Moreover, given the speculative nature of the claims, plaintiffs cannot prove sufficient hardship such that the Court should hear the case now.

Plaintiffs have also failed to state a claim under § 3604(b) of the FHA. Plaintiffs argue that the FHA's language making it unlawful "to discriminate against any person in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith ... on the basis of race...." applies in this case. Plaintiffs argue that the Bypass is a "provision of service in connection" with housing under the FHA and that it is being provided in a discriminatory manner because of the disproportionate adverse impact on African Americans (noise, diminished property values, air pollution, etc.). This Court declines to follow the non-binding cases cited by plaintiffs in their opposition that give the FHA such a broad reading as that propounded by plaintiffs. This Court holds that plaintiffs have failed to state a claim under § 3604(b) of the FHA.

**E. Federal Aid Highway Act, 23 U.S.C. § 101; Administrative Procedure Act, 5 U.S.C. §§ 702–704 (Counts IV and V)**

As the Federal Aid Highway Act ("FAHA") does not authorize a private cause of action, plaintiffs appear to bring their claim through the Administrative Procedure Act ("APA"), which provides for judicial review of agency action. *See* Compl. at 63 (APA confers private right of action on "[a] person suffering legal wrong because of Agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. § 702.) The APA does not contain a specific limitations period. Courts in other circuits have applied the six-year statute of limitations of the Tucker Act, 28 U.S.C. § 2401(a), to a complaint under the APA for review of agency action. *See, e.g., Sierra Club v. Slater*, 120 F.3d 623, 630–31 (6th Cir.1997).

To determine whether plaintiffs' FAHA claims are within the six-year limitations period, the Court must determine when the cause of action accrued. Under the APA, a right of action accrues at the time of "final agency action." 5 U.S.C. § 704. To determine whether agency action is final, "[t]he core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992). The Sixth Circuit has held that a final EIS or the ROD issued thereon constitutes "final agency action" for purposes of the APA. *See Sierra Club*, 120 F.3d at 631 (collecting cases from Ninth, Second, and Third Circuits).

This Court holds that plaintiffs' allegation that defendants violated the FAHA accrued when the FHA issued the final EIS, May 30, 1989, or, at the latest, the ROD issued thereon, August 17, 1989. Therefore, this Court concludes that plaintiffs' claims under the FAHA, having been filed more than six years thereafter, are time-barred.

---

**4.** The only fact plaintiffs rely on for their entire § 3604(a) claim is that State Defendants have stated that the use of block grant funds to develop an area within Jersey Heights is "not consistent" with their plans for the Bypass, and that they will recommend against the use of block grant funds to develop the area. However, as a recommendation, and not a final rejection of funding, it is still premature for plaintiffs to challenge it under the Fair Housing Act.

### F. National Environmental Policy Act, 42 U.S.C. § 4321 (Count VI)

The National Environmental Policy Act ("NEPA") requires federal agencies to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Because NEPA does not authorize a private cause of action, this Court will also construe plaintiffs' claims in Count VI as having been brought under the APA, which provides for judicial review of agency action.

As noted above, APA actions are subject to the six-year statute of limitations imposed by 28 U.S.C. § 2401(a). A final EIS or the ROD issued thereon constitutes final agency action for purposes of the APA. *Sierra Club*, 120 F.3d at 631. Moreover, given that plaintiffs' interest under the NEPA is to ensure that the EIS is prepared in compliance with the law, it makes sense that a NEPA cause of action accrues when the ROD approving the final EIS is issued. In this case, the ROD approving the final EIS was issued on August 17, 1989. Thus, when plaintiffs filed their complaint on September 15, 1997, the limitations period had long been expired, and plaintiffs' claims under the NEPA are time-barred.

In the event that the Fourth Circuit would not follow those cases that use the six-year limitations periods in analyzing the timeliness of plaintiffs' FAHA and NEPA claims, this Court finds that plaintiffs' claims under FAHA and NEPA are barred by the equitable doctrine of laches.[5] Laches is an affirmative defense which requires the defendant to show (1) lack of diligence by the plaintiff and (2) prejudice to the defendant. *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990), *cert. denied*, 501 U.S. 1260, 111 S.Ct. 2916, 115 L.Ed.2d 1079 (1991). Lack of diligence is shown when "the plaintiff delayed inexcusably or unreasonably in filing suit." *Id.* (internal citations omitted). An inexcusable or unreasonable delay occurs only after the plaintiff discovers, or with reasonable diligence could have discovered, the facts giving rise to its cause of action. *Id.* The defendant "is aided by the inference of prejudice warranted by the plaintiff's delay."

*Giddens v. Isbrandtsen Co.*, 355 F.2d 125, 128 (4th Cir.1966). The greater the plaintiff's delay, the less prejudice required to show laches. *White*, 909 F.2d at 102. *See Fair Woods Homeowners Ass'n v. Pena*, 1996 WL 1843 (4th Cir.1996) (unpublished) (affirming district court's finding plaintiff's FAHA and NEPA claims barred under doctrine of laches).

Plaintiffs knew, or, with reasonable diligence should have known, of the Alternate 4 Bypass, at the latest, when the FHA issued its ROD on August 17, 1989. Plaintiffs have not set forth a reasonable excuse for the delay of over eight years in filing their claim that defendants violated FAHA and NEPA. As discussed above, the Court rejects plaintiffs' argument that their claims would not have been ripe prior to March 1997, and therefore, lack of ripeness is not a valid excuse. Defendants' alleged violations of FAHA and NEPA occurred prior to the time when the FHA issued the ROD approving the final EIS, and plaintiffs' injuries (lack of a legally-prepared EIS) under FAHA and NEPA occurred at that time. Since plaintiffs' delay is lengthy, defendants do not have to demonstrate the degree of prejudice required if the delay had been less aggravated. *White*, 909 F.2d at 103.

With respect to the second prong of the laches analysis, prejudice, it is manifest that the defendants here will be prejudiced in precisely the manner as the defendants in *Fair Woods*. In that case, the Fourth Circuit stated, "This action prejudices Defendants by requiring the agencies to reexamine the environmental data ten years after the final EIS was released for public inspection and comment." *Fair Woods*, 1996 WL 1843, at **4.

Therefore, under the doctrine of laches, the Court finds that plaintiffs' delay in bringing suit until September 1997—over eight years after the final EIS and ROD were issued—was inexcusable and unreasonable, and that this delay prejudiced defendants. Therefore, plaintiffs' claims under the FAHA and NEPA are barred by the doctrine of laches.

---

5. The Fourth Circuit has not explicitly addressed the issue of whether FAHA or NEPA claims should be governed by the Tucker Act's six-year statute of limitations.

G. *Maryland Environmental Policy Act, Md.Code Ann., Nat. Res. I, § 1–301 et seq. (Count VI)*

Given that the Court has no jurisdiction over the federal claims, as discussed above, the Court should not exercise supplemental jurisdiction over the Maryland Environmental Policy Act action, a state law claim. *See* 28 U.S.C. § 1367(c)(3).

For the foregoing reasons, this Court will GRANT each of Defendants' Motions to Dismiss. An appropriate order will be entered separately.

## JUDGMENT ORDER

For the reasons stated in a Memorandum Opinion of even date, it is, by the Court, this 28th day of April, 1998, ORDERED AND ADJUDGED:

1. That the motions to dismiss of defendants Parris N. Glendening, in his official capacity as Governor of the State of Maryland, the State of Maryland, Parker F. Williams, in his official capacity as Administrator of the Maryland State Highway Administration, the Maryland State Highway Administration, David L. Winstead, in his official capacity as Secretary of the Maryland Department of Transportation, the Maryland Department of Transportation, Philip L. Tilghman, in his official capacity as President of the Wicomico County Council, Theodore Shea, in his official capacity as Acting Director of the Wicomico County Planning and Zoning Office, Wicomico County, Maryland, the Federal Highway Administration, Rodney E. Slater, in his official capacity as Secretary of the United States Department of Transportation and the United States Department of Transportation, BE, and the same hereby ARE, GRANTED;

2. That the Plaintiffs' Complaint BE, and it hereby IS, DISMISSED, with prejudice; and

3. That the Clerk mail copies hereof and of the said Opinion to counsel.